DAVID LORTSCHER, APPELLEE, V. KENNETH H. WINCHELL, APPELLANT.

133 N. W. 2d 448

Filed February 19, 1965.  No. 35672.

Richard H. Hansen, for appellant.

Dwight Griffiths and Robert S. Finn, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

BOSLAUGH, J.

This is an action for an accounting and other equitable relief brought by David Lortscher as plaintiff against Kenneth H. Winchell, the defendant. The action was brought to determine and recover amounts alleged to be due the plaintiff from the defendant as the

result of their operation of a grain storage business, to determine the rights of the parties in certain storage facilities purchased by them, and to partition the property.

The trial court found generally for the plaintiff. Both parties filed motions for new trial which were overruled. The defendant has appealed. There is no cross-appeal.

In 1954, the defendant entered into a lease with the Chicago, Burlington & Quincy Railroad Company for property located in Table Rock, Nebraska, and purchased a roundhouse structure located upon the property. The defendant then converted the roundhouse into a grain warehouse, obtained a license to operate a grain warehouse, and entered into a grain storage agreement with the Commodity Credit Corporation of the United States Department of Agriculture. The defendant was advised by both state and federal officials that it would be necessary for him to have a full-time manager at the warehouse who was a qualified and capable grain elevator man.

The plaintiff has been engaged in the grain storage business at Bern, Kansas, since 1948. On August 1, 1954, the defendant entered into a written contract with the plaintiff concerning the operation of the roundhouse at Table Rock, Nebraska, as a grain warehouse. The contract, which is identified as exhibit No. 1 in the record, provided generally that the defendant would furnish the warehouse at his expense. The plaintiff agreed to fill and remove grain in the warehouse at no expense to the defendant, care for the grain, and maintain it in a proper condition. The parties were to share equally the expense of the license, bond, insurance, utilities, fumigant, and other miscellaneous expenses.

The contract further provided that it should continue in full force and effect so long as the warehouse was used for the storage of grain for the United States Department of Agriculture "unless amended by agreement

of both parties." The contract also provided that it should not be construed to create a partnership or an employer-employee relationship between the parties.

The contract then provided: "Losses, if any, shall be borne by the parties in equal shares. Gross income shall be divided on or before the 30th day of June of each calendar year, two-thirds to First Party and one-third to Second Party. Where the warehouse is not emptied and refilled, and results in depriving First Party of two and one-half cents per bushel from the United States Department of Agriculture, then First Party shall receive one and two-thirds cents per bushel of grain stored before the division of two-thirds to First Party and one-third to Second Party is made. There shall be deducted from each party's share, any item of indebtedness required to be paid by him."

The following year defendant purchased two steel water tanks at Table Rock, two water tanks at Wymore, Nebraska, and leased the property at Wymore where the tanks were located. The warehouse and tanks at Table Rock and the tanks at Wymore are referred to in the record as "old storage."

In 1957, the parties purchased a 200,000-bushel capacity storage building from the Behlen Manufacturing Company which was erected at Table Rock. In 1960, the parties purchased a 20,000-bushel capacity bin, identified in the record as the "B. S. & B." bin, which was also erected at Table Rock. The Behlen building and the B. S. & B. bin are referred to in the record as the "new storage."

From time to time the parties met and entered into settlements in which they made a division of the income that had been received and reimbursed each other for expenses that had been paid. The last such settlement was made on August 23, 1960, and resulted in a division of income received for storage of grain to June 30, 1960. Both parties contend that there were mistakes in one or more of the settlements and the defendant

contends that the written contract entered into on August 1, 1954, should be reformed in part. There is an issue as to the right of the plaintiff to participate in the income received after November 15, 1960, and an issue as to the extent and nature of the interest of the plaintiff in the new storage facilities. These are the issues to which the assignments of error relate and the issues which will be considered in disposing of this appeal.

The record consists of over 1,000 pages of testimony and 97 exhibits, many of which consist of several pages. The evidence will be summarized only to the extent necessary to an understanding of the issues which will be considered in disposing of the appeal.

This is an action for equitable relief in which we are required to try the issues of fact complained of de novo and reach an independent conclusion without reference to the findings of the district court. The review, however, is subject to the rule that when evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the opposite. Stibor v. Farrell, 177 Neb. 437, 129 N. W. 2d 449.

Much of the record consists of the testimony of the parties concerning the twelve settlements which they entered into between April 10, 1955, and August 23, 1960, and the division of the income from grain storage which they made. The principal dispute in this regard relates to the right of the defendant to receive 1⅔ cents per bushel of grain stored for a full year "before" the division of the balance of the income between the parties. This payment was computed only as to grain which remained in "old storage."

At the time the parties entered into exhibit No. 1, the Department of Agriculture paid a service charge of 2 cents per bushel for grain which remained in storage for a full year in addition to regular storage fees. When

grain was received or loaded out, there were handling charges paid which combined amounted to 4½ cents per bushel. Apparently, the provision in the contract for the payment of 1⅔ cents per bushel to the defendant before the division of the balance of the income was intended as compensation to the defendant for the reduction in revenue which resulted when grain remained in storage and the plaintiff did not have the responsibility and expense incident to receiving and shipping grain from the warehouse. In any event, the effect of this provision was to increase the defendant's share of the income when grain remained in storage.

Approximately 2 years after the parties entered into exhibit No. 1, the payment of the 2 cents per bushel service charge was discontinued. The defendant now contends that exhibit No. 1 should be reformed and the settlements recomputed so that the defendant will receive 3 cents per bushel for grain remaining in storage after the payment of the 2 cents per bushel service charge was discontinued, and the payment will be made "after" the division of income between the parties and paid entirely from the plaintiff's share of the income.

In order to warrant the reformation of a written instrument in any material respect, the evidence must be clear, convincing, and satisfactory; and until overcome by such proof, the terms of the instrument must stand as evidencing the intention of the parties. Lincoln Equipment Co. v. Eveland, 173 Neb. 174, 112 N. W. 2d 755. There is no clear, convincing, and satisfactory evidence in this case to show that exhibit No. 1 should be reformed. We think the trial court was correct in refusing to grant this relief to the defendant.

The record shows that the parties made their settlements in the following manner: A written memorandum of each settlement was made and each of the parties received a copy of the memorandum. The income which the defendant had received since the date of the last settlement was listed and a computation made to divide

the income between the parties. The defendant then wrote a check to the plaintiff for his share of the income. The expenses that had been paid by each of the parties were listed. Each party then wrote a check to the other so that each party was reimbursed for one-half of the expenses he had paid.

The district court refused to set aside or recompute any of the settlements which the parties had made, and held that the settlements were binding on both parties and conclusive as to all matters covered in the settlements. We think this determination was correct. In a similar case this court said: "The parties agree that they met once a year, or thereabouts; that they had their accounts before them, and that debits and credits were demanded, given, and refused, resulting in the giving of a new note for the ascertained balance and the surrender of the old note. The law favors and encourages settlements, and in the absence of fraud, error, or mistake, they should not be set aside. The record conclusively shows a meeting of the parties, a presentation, examination and adjustment of their accounts, the making of new notes for the found balance and the surrender of the old ones. Such acts constitute settlements." Stuart v. Torrey, 106 Neb. 608, 184 N. W. 215.

It is apparent from the record that the parties did not follow a uniform basis in computing each of the settlements which they made. Thus, there is some basis for an assertion that there were mistakes made in one or more of the settlements. But this alone is not sufficient to entitle either party to reformation of any particular settlement.

Equity will decree reformation of a contract only if the mistake is mutual, or for fraud or inequitable conduct. Neary v. General American Life Ins. Co., 140 Neb. 756, 1 N. W. 2d 908. There is no clear, convincing, and satisfactory evidence of a mutual mistake as to any of the settlements which were made. There is no show-

ing of a mistake common to both parties, each laboring under the same misconception.

There is a further reason why the settlements which the parties made in this case should not be disturbed. Each settlement which the parties made was a practical interpretation of their contract. The interpretation given a contract by the parties themselves while engaged in the performance of it is one of the best indications of the true intent of the contract. Lewis v. Gallemore, 173 Neb. 211, 113 N. W. 2d 54. Ordinarily, such a construction of the contract should be enforced. McLeod v. Crawford, 176 Neb. 513, 126 N. W. 2d 663.

The defendant contends that the plaintiff has no right to share in the income received after November 15, 1960. The defendant's theory is that he had the right to terminate the plaintiff's services at any time and that they were terminated as of November 15, 1960.

The written contract between the parties provided that it should continue in force so long as "said warehouse" was used for the storage of grain "unless amended by agreement of both parties." The contract did not give the defendant the right to terminate the plaintiff's interest in the contract at will and specifically provided that it did not create an employer-employee relationship between the parties.

There was grain in storage in some of the facilities operated under the contract until 1962, and the record does not show an agreement between the parties that the contract should terminate as of November 15, 1960. The parties discussed a termination of the contract and a settlement of their rights in November 1960, but they failed to reach an agreement. The evidence does not show that the plaintiff's right to participate in the income terminated on November 15, 1960.

The trial court found that the balance due the plaintiff from the defendant was $15,509.07 after dividing the income received and allocating the expenses and losses incurred, in accordance with the contract of the parties

as interpreted by them in the June 1960 settlement. The record supports this finding and we believe that it is correct.

The remaining issue relates to the ownership of the Behlen building and the B. S. & B. bin at Table Rock. Each of the parties signed the contract for the purchase of the Behlen building. They each paid one-half of the downpayment. The purchase order recited that the balance due was "to be financed." A controversy developed during the construction and completion of the building which resulted in a settlement with the Behlen Manufacturing Company that was made on October 9, 1959. The settlement was accomplished by executing a mutual release and delivering a promissory note in the amount of $36,500 signed by the plaintiff and the defendant.

The purchase order for the B. S. & B. bin was signed by the plaintiff, and the downpayment of $1,000 was made by him. The defendant later paid $3,200.87 on the contract. The parties reimbursed each other for one-half of these amounts in the settlement which they made on August 23, 1960. The balance of the purchase price was paid by the plaintiff.

The income received from the storage of grain in the Behlen building and the B. S. & B. bin was divided on a different basis from that prescribed in exhibit No. 1. The income from the storage of grain in the Behlen building and the B. S. & B. bin was divided equally and there was no payment to the defendant for grain which remained in storage in these facilities.

The defendant contends that he owns the Behlen building and the B. S. & B. bin, and that the plaintiff has no interest in these facilities other than repayment of the amounts advanced by him toward their purchase. The defendant further contends that one-third of the income received by the plaintiff from these facilities was intended as repayment of the amounts advanced by him and should be credited against the amounts ad-

vanced. The defendant claims that his testimony to this effect is corroborated by a letter dated October 22, 1958, signed by the plaintiff, which was sent to the United States Department of Agriculture.

The letter was prepared by a lawyer at the direction of the defendant and submitted to the plaintiff for his signature. It was sent in response to a demand by the Department of Agriculture that the plaintiff report in detail what arrangements and agreement he had with the defendant and what interest he had in the defendant's grain storage operation. At that time the plaintiff's license at Bern, Kansas, had been suspended and he had been ordered to ship out all of his grain. When it was determined that the plaintiff had the proper amount and quality of grain in storage, he was reinstated.

The letter itself is ambiguous. It contains language which tends to corroborate in part the defendant's theory of the facts. It also contains language which supports the plaintiff's contention. The letter recites that the plaintiff was "employed" as a supervisor-manager by the defendant and "subject to dismissal at his order"; that the plaintiff assisted the defendant "financially" in the purchase of the Behlen building by putting up one-half of the downpayment; and that the defendant had the option to "buy my one-half interest in the building at any time." The letter then stated: "This was really a loan to Winchell by me of one-half of the down payment money. I still own a one-half interest in the Behlen building, subject to the option of Winchell of paying me at any time and also subject to the payment to Behlen of the balance of the unpaid purchase price. I continued to manage and supervise the grain storage facility at Table Rock, Nebraska for Winchell as his manager and employee under the same general terms as our original agreement made in 1954, and he continued to be the owner of the entire operation and grain storage business, including the new (1957) building; at all times I

operated and I still operate under Winchell's direction and authority.

"I have neither had nor claimed any interest in the grain storage business of Kenneth H. Winchell, operated under his name at Table Rock, Nebraska, and the financial statement that you requested (copy enclosed) also states that I have no interest in that business, other than a working interest in a building used by him. My only interest at that place, other than manager, is the fact that I advanced for the accommodation of Kenneth H. Wichell (Winchell) one-half of the down payment money in the purchase of the Behlen Building which I consider only as a loan, since he can purchase my interest at any time by merely repaying me my down payment money."

. The letter is inconsistent in that it refers to a "loan" to the defendant, and also to an option on the part of the defendant to "buy" the plaintiff's interest in the Behlen building. The inconsistency may be more apparent than real because the plaintiff's position has been that he would sell his interest in the Behlen building and the B. S. & B. bin for less than the amounts that he advanced.

The real controversy is over the defendant's claim that one-third of the plaintiff's share of the income from these facilities was to be credited against the amounts advanced by the plaintiff for the purchase of the facilities. There is nothing in the October 1958 letter which corroborates this part of the testimony of the defendant.

The settlement with the Behlen Manufacturing Company was made about a year after the October 1958 letter was signed. The plaintiff paid one-half of his share of the note to Behlen on October 13, 1959. In June 1960, the defendant paid the balance of the note and the plaintiff then reimbursed the defendant for the plaintiff's share of the balance of the note plus interest in the amount of $192.50. The B. S. & B. bin was not pur-

chased until 1960. The parties never executed any memorandum or other evidence of indebtedness and there is no reference in any of the settlements to such an indebtedness or an application of a part of the plaintiff's share of the income to the reduction of such an indebtedness. At about the time of the purchase of the Behlen building the defendant handed to the plaintiff a memorandum, exhibit No. 23, concerning five items that should be attended to. Items (3) and (4) were: "(3) Our business set up—Partnership, Corp., or what. (4) Throw bldgs. etc. together in business or keep seperated (separated) as is now."

We think the evidence as a whole supports the plaintiff's contention that he owns a one-half interest in the Behlen building and the B. S. & B. bin and that the finding of the district court on that issue was correct.

From our examination of the record we have arrived at the same conclusion as the district court concerning the issues presented by this appeal. The judgment of the district court is, therefore, affirmed.

AFFIRMED.