MUNICIPAL ENERGY AGENCY OF NEBRASKA, A POLITICAL SUBDIVISION, APPELLEE, V. CITY OF CAMBRIDGE, APPELLANT.

430 N.W.2d 44

Filed October 7, 1988.   No. 87-035.

Charles J. Cuypers, of Sherwood Law Office, for appellant.

62

Richard M. Duxbury, of Erickson & Sederstrom, P.C., for appellee.

Boslaugh, White, and Shanahan, JJ., and Howard, D.J., and Colwell, D.J., Retired.

Boslaugh, J.

On August 6, 1979, the defendant, City of Cambridge, Nebraska, entered into a contract, known as an Electrical Resources Pooling Agreement (ERPA), with the Nebraska Municipal Power Pool (NMPP). The contract was assigned to the plaintiff, Municipal Energy Agency of Nebraska (MEAN), the successor to NMPP, on January 11, 1982.

Under the ERPA contract a participant was required to choose whether it wanted bulk or service power under the agreement. Under a bulk power arrangement, the participant contracts to deliver its power production to MEAN, pays a standard rate, and MEAN schedules the power.

The city originally intended to become a bulk service power participant, and an ordinance authorizing the mayor to execute the bulk service power agreement was passed. However, disputes arose between the city and MEAN, and the city never executed the bulk service power schedule (schedule K).

Under a service power arrangement, the participant decides on a day-to-day basis how much power it needs and from whom it will purchase the power. The ERPA contract requires that a participant act in accordance with the "service schedules." Schedule F is used for service power participants. The contract does not require that a participant execute such a schedule, but merely requires that the participant act in accordance with that schedule.

The contract does not require the execution of any other document. The schedules were developed originally by the pool staff and set out the charges to be billed for electrical power services. The management committee of the pool, comprised of a representative of each participant, reviews and approves the schedules and any amendments. In proposing schedules and amendments, the normal practice was to send each participant a copy of the proposed amendment for final approval at a meeting. The defendant city was treated as a service power

participant and was billed according to the service schedule adopted on March 6, 1981.

The city contends that its authorized representative (Councilman Gufford) was not present at the meetings at which schedule F was adopted and later amended. The city's powerplant supervisor, Kenneth Fichtner, did attend those meetings, but the city contends Fichtner was not authorized to approve the schedule on behalf of the city.

The service power schedule (schedule F) requires that participants reimburse MEAN for transmission charges (also called "wheeling" charges). Included in those charges is the applicable "billing demand ratchet" (ratchet) in effect, which is based on MEAN's agreement with the Nebraska Public Power District. The ratchet is fixed by the highest demand for power in a given period. That demand level is in effect for the succeeding 11 months, and MEAN is obligated to pay at that demand level regardless of whether that amount of power is used.

The contract requires each participant to reserve transmission capacity in advance. In effect, the participant is required to nominate a demand amount, which is the maximum the participant will be entitled to receive unless surplus is available because other participants are not using their maximum demand capacity. In August of 1979, Fichtner made a reservation for the city of 800 kilowatts. In 1981 he increased the demand reservation of the city to 1200 kilowatts. Each month a participant is billed for the demand capacity reserved whether it is used or not. The city paid all such charges until October 1982.

From August of 1979 to July 15, 1982, the city bought power and transmission services from MEAN. During that time, both parties treated the city as if it were a service power participant. The city bought power on a day-to-day basis, and it was billed for transmission charges as a service power participant. Each day the powerplant manager, Fichtner, called MEAN and reserved the amount of power required for that day. During the course of the 3-year period, the city increased the amount of power it purchased as a service power participant, although Fichtner had no recollection of a long-term agreement between the city and MEAN to purchase power. However, Fichtner

testified that he had assumed that MEAN was treating the city as a service power participant.

It is undisputed that the city timely paid its power bills from MEAN until October of 1982. In July of 1982, the city discontinued scheduling and paying for power from MEAN. It paid the ratcheted transmission charges for the months of August and September of 1982, but at that time decided to discontinue paying those charges.

The second amended petition was filed October 16, 1984, to recover unpaid "wheeling" or transmission charges. A bench trial was held on March 5, 1986. On June 23, 1986, the trial court found that ERPA participants could choose whether they would be service power or bulk power participants; that by their actions, the parties chose for the city to be a service power participant; that the schedules necessary for service power participation had been adopted as contemplated in the contract; that the city had been represented at the meetings by Fichtner; and that the city was estopped to deny the contract. The trial court found that the city owed MEAN $14,673.55 plus prejudgment interest, for a total award of $19,994.62.

The city has appealed and has assigned as error the finding that there was a valid contract between the parties with respect to ratcheted transmission charges. The city argues that the trial court's decision reformed the terms of the contract and that MEAN failed to establish the existence of the schedules necessary to form a complete and binding contract. Finally, the city argues that since it was not billed for any use of power after it canceled service from MEAN, it does not owe MEAN any transmission charges.

This is a suit on a contract and is an action at law. The standard of review for an action at law, tried without a jury, as in this suit, is well settled in Nebraska. In *Osmond State Bank v. Uecker Grain*, 227 Neb. 636, 637, 419 N.W.2d 518, 519 (1988), we said:

> In reviewing an action at law tried without a jury, it is not the role of the Supreme Court to resolve conflicts in or reweigh the evidence. Rather, the court presumes that the trial judge resolved any controverted facts in favor of the successful party. This court will also consider the evidence

and the permissible inferences therefrom most favorably to the successful party. Moreover, in such actions the findings and conclusions of the trial judge have the effect of a jury verdict and will not be set aside unless clearly wrong.

This standard was reiterated in *Wells Fargo Alarm Serv. v. Nox-Crete Chem.*, 229 Neb. 43, 424 N.W.2d 885 (1988).

The pleadings show that MEAN was advancing two theories of recovery. The second amended petition alleged a cause of action for breach of contract because of the city's failure to pay accrued charges for the period of October 1982 through June 1983. The second cause of action was based in quantum meruit for the value of services provided to the city. There was no prayer for the equitable relief of reformation.

The city argues that the trial court reformed the contract when it found that even though the city expressed its intention, by ordinance, to enter into a bulk power contract, the parties actually had a service power contract.

Generally, this court will dispose of a case on appeal on the theories which were presented to the trial court. *Ward v. Nebraska Electric G. & T. Coop., Inc.*, 195 Neb. 641, 240 N.W.2d 18 (1976); *Kearney Clinic Bldg. Corp. v. Weaver*, 211 Neb. 499, 319 N.W.2d 95 (1982); *O'Keefe Elevator v. Second Ave. Properties*, 216 Neb. 170, 343 N.W.2d 54 (1984); *Lincoln Grain v. Coopers & Lybrand*, 216 Neb. 433, 345 N.W.2d 300 (1984); *Cimino v. W. A. Piel, Inc.*, 227 Neb. 196, 416 N.W.2d 505 (1987).

It is undisputed that the city executed ERPA expecting to be a bulk power participant, but then failed to execute any other documents necessary to establish its service as a bulk power participant. The evidence shows that the city bought and paid for power and transmission services from MEAN under some type of arrangement. An aid in interpreting contracts is the course of performance of the parties. In *Smith v. Daub*, 219 Neb. 698, 703, 365 N.W.2d 816, 820 (1985), we held that "in attempting to construe the meaning of a contract . . . the interpretation given a contract by the parties themselves while engaged in the performance of it is one of the best indications of the true intent of the contract, and ordinarily such construction

of the contract should be enforced." See, also, *Lortscher v. Winchell*, 178 Neb. 302, 133 N.W.2d 448 (1965).

In *Omaha P. P. Dist. v. Natkin & Co.*, 193 Neb. 518, 524-25, 227 N.W.2d 864, 868-69 (1975), this court held:

> In the construction of questioned provisions in a contract, the rule has long been established in this jurisdiction that the interpretation given to a contract by the parties themselves while engaged in the performance of it is one of the best indications of the true intent of the contract. Ordinarily, such a construction of the contract should be enforced. . . . This is a rule of justice and equity, and we apply it herein. To hold otherwise would permit OPPD to take advantage of its own omissions and permit it to interpret the contract of the parties contrary to its own actions.

(Citation omitted.)

In this case MEAN and the city dealt with each other in much the same manner—they were parties to a validly executed agreement, but not all steps were taken which were necessary to identify the type of power participant the city was. As both parties concede, they acted as if the city were a service participant. In addition, the ERPA contract itself does not obligate a participant, by its language, to execute any further agreement. It merely states that a participant must choose which type of service it wishes to use. Although the contract does not obligate a participant to execute schedule K, its execution was necessary in order to carry out the bulk power arrangement. Clearly, the parties were acting in accordance with some agreement. The finding that there was a valid contract between the city and MEAN was not clearly wrong.

The city argues that because its authorized representative did not attend the board meetings at which the service power charges were finally adopted, the city is not bound by those charges. It further argues that Neb. Rev. Stat. § 18-412.06 (Reissue 1987) requires that an ordinance be passed for the adoption of service power schedules as well as any other contract to which the city might bind itself. Ordinance No. 81, which was properly passed on August 6, 1979, authorized the city to enter into the bulk service contract.

In this case, there was a valid contract under which both parties performed. The action of the city, buying power, was authorized; the only disputes relate to the type of arrangement which the city wanted to make and whether Fichtner, its representative at the meetings, was authorized to approve service schedule F. There is no evidence that the city specifically withheld authority from Fichtner. In fact, Fichtner dealt daily with MEAN in ordering power for which the city paid.

MEAN argues, and the trial court found, that the city is estopped from denying the validity of the contract. Ordinarily, the doctrine of equitable estoppel cannot be invoked against a municipal corporation in the exercise of governmental functions, but exceptions are made where right and justice so demand, particularly where the controversy is between one class of the public as against another class. *Hammer v. Department of Roads*, 175 Neb. 178, 120 N.W.2d 909 (1963), citing *Talbott v. City of Lyons*, 171 Neb. 186, 105 N.W.2d 918 (1960). In *Hammer*, this court held:

> We feel the rule that the doctrine of equitable estoppel may be invoked against a municipal corporation where there have been positive acts by the municipal officers which may have induced the action of a party and where it would be inequitable to permit the corporation to stultify itself by retracting what its officers had done . . . .

175 Neb. at 187, 120 N.W.2d at 915. In *Hammer*, the plaintiffs were contesting the State's refusal to allow access off a state highway onto a street in Kearney which had been dedicated, but not yet developed. The evidence in that case showed that the city knew when it contracted with the State concerning the highway that the State did not intend to allow access off any street between the two access points already agreed upon. Even though the city did not specifically agree that it would not open an access way between the two already agreed-upon points, the city knew the State would not allow access. This court held that the State was not bound by the record of dedication of intent to open the street, and found that the denial of access was not arbitrary and unreasonable.

The city argues that because it received no power from MEAN after July 15, 1982, when the city canceled service, it

was under no obligation to reimburse MEAN for the ratcheted transmission charges. This argument is based on the semantics of ERPA. The contract provides that participants will reimburse MEAN for the services which NPPD provides to service participants, including ratcheted transmission charges. When a new peak demand for electricity by the participants was reached in July of 1982, MEAN became obligated to pay for power at that level for the succeeding 11 months. As a service power participant at that time, the city was obligated under ERPA and schedule F to reimburse MEAN for the transmission charges. It was a matter of contract, to which the city had agreed and acted upon.

After entering into a contract for the purchase of electrical energy and transmission services, and purchasing and paying for energy and transmission services under the contract for a period of approximately 3 years, the city will not now be heard to claim that no valid contract existed between the parties.

The judgment of the district court is affirmed.

AFFIRMED.