MARLIN FRENZEN, APPELLANT, V. EUGENE E. TAYLOR AND
PATRICIA A. TAYLOR, HUSBAND AND WIFE, APPELLEES, RODNEY
WETOVICK, INTERVENOR-APPELLEE.
439 N.W.2d 473

Filed May 5, 1989.   No. 87-771.

John M. Gerrard and Kathleen Koenig Rockey, of Domina, Gerrard, Copple & Stratton, P.C., for appellant.

Donald R. Treadway, of Treadway & Bird, P.C., for appellees.

Gerald M. Stilmock, of Tessendorf, Milbourn & Fehringer, P.C., for intervenor-appellee.

Boslaugh, Shanahan, and Grant, JJ., and Knapp and Rowlands, D. JJ.

Shanahan, J.

Marlin Frenzen filed a petition in the district court for Nance County, seeking specific performance of a contract with Eugene E. and Patricia A. Taylor for purchase of Taylors' farm. Rodney Wetovick intervened in the suit, also seeking specific performance of a contract with Taylors for the purchase of their farm. The district court denied equity relief to Frenzen and granted specific performance to Wetovick. Frenzen appeals.

## STANDARD OF REVIEW

An action for specific performance of a contract is an equity action. *Brown v. Knox*, 219 Neb. 189, 361 N.W.2d 540 (1985).

> In an appeal of an equity action, the Supreme Court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the Supreme Court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

*Hughes v. Enterprise Irrigation Dist.*, 226 Neb. 230, 234, 410 N.W.2d 494, 497 (1987). See, also, Neb. Rev. Stat. § 25-1925 (Reissue 1985). "An action for specific performance is governed by the elements, conditions, and incidents which control the administration of all equitable remedies." *Mohrlang v. Draper*, 219 Neb. 630, 633, 365 N.W.2d 443, 446 (1985).

## AGREEMENTS FOR PURCHASE OF TAYLORS' FARM

Sometime in September 1986, Taylors decided to list for sale certain farmland owned by them in Nance County. Immediately after the "For Sale" sign went up on the Taylors' property, Frenzen, who had lived on and farmed the land as a tenant for 25 years, expressed an interest in buying the land. Richard Wallick, real estate agent for the Taylors, recalled Frenzen's expressing his belief that the property was worth no more than $70,000, which was substantially less than Taylors'

initial asking price. Wallick's efforts to sell the property continued, as he combed the area for potential buyers for Taylors' farm.

In October of 1986, Wetovick indicated his interest in buying the Taylor farm. Wallick showed the farm to Wetovick, who offered $85,000 for the Taylor farm in early December. Taylors rejected Wetovick's offer, and negotiations continued between Taylors and Wetovick until they agreed on a sale price of $90,000 for the farm.

Taylors and Wetovick entered a purchase agreement, dated December 19, 1986, containing two specific contingencies: Taylors' enrolling at least 75 acres of their farm in the federal government's Conservation Reserve Program (CRP), and an appraisal by a licensed appraiser, setting the farm's value at a figure equal to or exceeding the purchase price offered by Wetovick. Both contingencies were for Wetovick's benefit alone. Wetovick believed that the appraisal was necessary to obtain sale financing from his bank, and CRP land would ensure a steady income from the farm. Consequently, when he signed the purchase agreement, Wetovick understood that he could waive either or both of these contingencies. The contract also stated that Taylors "[agree] to furnish without delay, [an] abstract of title certified to date of sale."

The Taylor-Wetovick contract specified March 1, 1987, as the closing date for the sale. Later, Taylors, for "[n]o particular reason," expressed their desire to advance the closing date to February 17, 1987. As Eugene Taylor expressed: "I had an investment opportunity on the 20th [of February], and I thought if I could have the money by that time I might take advantage of it." The closing date for February 17 was "only a convenience," and "from day one," Taylors intended to close the sale whenever possible.

Wallick then began to inquire into the feasibility of enrolling acres in the CRP. Sometime in January 1987, Wallick checked with local soil conservation offices and was informed that, as a condition of a sale, enrollment of the Taylor farm in the CRP would constitute a fraud on the federal government. At the end of January, Wallick received a phone call from Frenzen, who asked "[i]f everything was going to happen" regarding the sale to Wetovick. Frenzen's wife, Judy, worked in the Nance County

soil conservation office and had become aware of the CRP contingency in the Taylor-Wetovick contract. At this point, Wallick was "a hundred percent convinced" that the property could not be enrolled in the CRP and that, without a waiver of the contingencies by Wetovick, the Taylor-Wetovick sale would not be consummated. At that time, Frenzen expressed further interest in buying the land with financial backing by his relatives in California.

On February 6, Frenzen and Taylors entered a purchase agreement which covered the same land involved in the Taylor-Wetovick sale and which contained a purchase price of $90,000. The Frenzen-Taylor agreement was "contingent upon the Purchase Agreement dated December 19, 1986 between the Seller and Rodney Wetovick not being consumated [sic] on or before February 17, 1987 as set forth in said agreement." Wallick, the realtor, told Frenzen that the contingencies in the Taylor-Wetovick agreement could be waived by Wetovick. The Frenzen-Taylor agreement required that Taylors furnish an abstract of title, showing Taylors' merchantable title for the farm, and specified February 20, 1987, as the date for closing the sale. Frenzen made a downpayment of $10,000.

On February 6, Taylors discovered that one of the three abstracts for their farm was missing and decided that title insurance would be needed to close the sale with Wetovick.

On or about February 13, 1987, Wallick told Wetovick about the existence of a second purchase agreement for the Taylor farm. There is a conflict in testimony regarding the extent of information conveyed to Wetovick concerning the additional purchase agreement. Wetovick testified that Wallick never told him about the terms of the contract, including the name of the other prospective purchaser or the fact that the other contract was contingent on Wetovick's failure to close the sale by February 17. Wallick, however, testified that he was "reasonably sure" that he told Wetovick that the Taylor-Wetovick sale had to be closed "on or about February 17th" or Frenzen's contract would become operative in the sale of Taylors' farm.

Near the time Wallick informed Wetovick about the other purchase agreement, Wallick told Wetovick that the CRP

contingency could not be accomplished. After learning that CRP enrollment would be impossible, Wetovick orally offered to pay Taylors $85,000 for their farm without CRP acres. However, Wallick informed Wetovick that this offer was unacceptable in view of Frenzen's offer of $90,000 without any contingencies.

Wetovick did not agree to waive the contingencies until February 16, 1987, when Wetovick knew that the sale would not be closed on February 17 on account of the delay in obtaining title insurance. Wallick testified that Taylors did not obtain title insurance before February 16 because Wetovick had not waived the CRP contingency. In Wallick's words, "We didn't order a title insurance policy for Rod [Wetovick] until we knew that he owned the farm. Until those contingencies were dropped we couldn't order title insurance. If we ordered it, we would have paid for it, and we weren't about to pay for it."

February 17 passed, and the Taylor-Wetovick sale was not closed. On February 18 and 20, Wetovick and Taylors signed an "Addendum" to their purchase agreement, reducing to writing Wetovick's previous oral waiver of the two contingencies contained in the original contract. The addendum also changed the closing date stated in the original purchase agreement to "as soon as the paperwork can be completed." Wallick testified that the parties had set a tentative closing date of February 28, 1987.

Also on February 18, Frenzen talked to Wallick regarding purchase of Taylors' farm. Wallick told Frenzen that Wetovick had waived the contract contingencies and that the sale to Wetovick would be completed. Frenzen testified that he was "overwhelmed" because, at midnight on February 17, he thought he "had the farm bought." Frenzen also testified that he offered to pay the balance of the purchase price on February 18 and 19, but that Wallick said Taylors would not sell the farm to Frenzen in view of the contract with Wetovick.

A policy of title insurance was not issued and mailed to Taylors' attorney until February 25, 1987. On February 26, Frenzen's attorney wrote Wallick and stated Frenzen's contract claim to the Taylor farm. As a result of the correspondence, the Taylor-Wetovick sale was not closed on February 28 as scheduled. Subsequently, Wetovick and Frenzen each filed a

specific performance suit against Taylors.

## COMPETING CLAIMS FOR SPECIFIC PERFORMANCE

When land or any interest therein is the subject matter of a contract, the power of a court of equity to grant specific performance is beyond question. [Citation omitted.] We have held that specific performance should generally be granted as a matter of course or right regarding a contract for the sale of real estate where a valid, binding contract exists which is definite and certain in its terms, mutual in its obligation, free from overreaching fraud and unfairness, and where the remedy at law is inadequate. [Citation omitted.] Real estate is assumed to possess the characteristic of uniqueness, and, therefore, special value, necessary for availability of specific performance.

*Mohrlang v. Draper*, 219 Neb. 630, 633, 365 N.W.2d 443, 446 (1985).

Wetovick's contract to purchase the Taylor farm was valid and remained in effect after Wetovick's oral waiver of contingencies on February 16. When Wetovick waived the contingencies in his contract on February 16, the contract for the sale of the Taylor farm had not been breached. At that point, the parties could validly modify their initial agreement, waiving contingencies and altering the initial closing date. "A written executory contract may be modified by the parties thereto at any time after its execution and before a breach has occurred, without any new consideration; and the terms of a written executory contract may be changed by a subsequent parol agreement before a breach thereof." *Pearce v. ELIC Corp.*, 213 Neb. 193, 201, 329 N.W.2d 74, 79 (1982); *Cole v. Hickey*, 215 Neb. 728, 340 N.W.2d 418 (1983).

Even in the absence of a change in the closing date, the Taylor-Wetovick contract remained effective on February 18, 1 day after the closing date specified in the contract. In the ordinary contract for the sale of real estate, time is not of the essence unless provided in the agreement itself or clearly manifested by the agreement construed in the light of surrounding circumstances. Where time is not of the essence,

performance must be within a reasonable time. *Dowd Grain Co., Inc. v. Pflug*, 193 Neb. 483, 227 N.W.2d 610 (1975). When a contract expressly provides for a specific closing date, performance is normally due within a reasonable time after the date mentioned. In *Tedco Development Corp. v. Overland Hills, Inc.*, 200 Neb. 748, 266 N.W.2d 56 (1978), this court faced a factual situation similar to the present case, that is, competing claims for specific performance. Regarding the time for performance of the first purchaser's contract, we expressed:

> The contract provided for a closing date of February 25, 1977. In 71 Am. Jur. 2d, Specific Performance, § 63, p. 91, it is stated: " * * * in the ordinary cases of sales of realty, the general object being to make a sale for an agreed sum, the time of payment is regarded in equity as formal, and as meaning only that the purchase shall be completed *within a reasonable time,* and substantially according to the contract, *regard being had to all the circumstances.*"

(Emphasis in original.) 200 Neb. at 755, 266 N.W.2d at 60. See, also, A. Corbin, Corbin on Contracts § 716 at 677 (one vol. ed. 1952) ("[T]he fact that a specific time is fixed for payment or for conveyance does not make 'time of the essence' . . . .").

The Taylor-Wetovick agreement did not contain a clause expressly stating or language otherwise indicating that time was of the essence in the sale. Frenzen relies primarily on the change in the closing date, initiated by Taylors, in arguing that the circumstances show that Taylors intended that time was of the essence. We disagree. Since closing on a specific date was not crucial for the parties in the Taylor-Wetovick contract, Taylors changed the closing date as a matter of convenience. As Eugene Taylor testified, from the outset of the Taylor-Wetovick transaction, he wanted to close the deal "whenever [it] was possible."

Frenzen devotes much of his brief to an argument concerning time as a factor in the Frenzen-Taylor agreement. Frenzen's argument misconstrues the issues presented by this appeal. Wetovick's right to specific performance is not restricted by a subsequent contract to which he is not a party. Wetovick's right to specific performance extended beyond February 17, 1987, as the result of his subsisting contract with

Taylors notwithstanding the passage of February 17 without a closing of the sale. Wetovick is entitled to specific performance of his contract with Taylors.

Frenzen also claims an independent right to specific performance of his contract. Frenzen's right to purchase the Taylor farm, however, was subject to the condition precedent that Wetovick's deal not close "on or before February 17, 1987 *as set forth in said agreement.*" (Emphasis supplied.) When a contractual duty is subject to the occurrence of a specific contingency or event as a condition, the condition must occur before a party is obligated to perform the contractual duty unless nonoccurrence is excused. See *Chadd v. Midwest Franchise Corp.*, 226 Neb. 502, 412 N.W.2d 453 (1987). Since time was not of the essence in the Taylor-Wetovick contract, the terms of the contract allowed a closing after February 17. Thus, the language in the Frenzen-Taylor contract actually reflects a misperception of the provisions in the Taylor-Wetovick contract. The language in the first part of the contingency expressed in Frenzen's contract, "on or before February 17, 1987," is inconsistent with the language in the second part of the contractual contingency, "as set forth in said agreement." When read as a whole, the language of the contingency expressed in the Frenzen-Taylor contract is susceptible to more than one reasonable interpretation and, therefore, ambiguous. See *American Sec. Servs. v. Vodra,* 222 Neb. 480, 385 N.W.2d 73 (1986). In attempting to ascertain the meaning of ambiguous terms of a contract, a court must determine the actual intent of the contracting parties, considering facts and circumstances which motivated each party to enter the contract, and the nature and subject matter of the contract. *Lauritzen v. Davis,* 214 Neb. 547, 335 N.W.2d 520 (1983); *Lone Oak Farm Corp. v. Riverside Fertilizer,* 229 Neb. 548, 428 N.W.2d 175 (1988).

When he signed the contract, Frenzen was informed that Wetovick was free to waive the contractual contingencies for purchase of the Taylor farm. Consequently, Frenzen knew that the Taylor-Wetovick sale might be consummated despite the impossibility of CRP enrollment. We find that all parties understood that Frenzen's contract was a "backup" contract and would operate only if the Wetovick sale fell through, an

event which never occurred. Furthermore, Frenzen's contract is subject to the Taylor-Wetovick sale's not closing "as set forth in [the Taylor-Wetovick] agreement." As we have already noted, Wetovick's contract allowed closing beyond February 17, the closing date designated in the Taylor-Wetovick contract. Taylors and Wetovick, however, were prepared to close their transaction soon after February 17, but refrained from closing in view of Frenzen's claim. Thus, we conclude that Frenzen and Taylors did not intend that their contract would become operative unless the Taylor-Wetovick sale was not closed on February 17, or within a reasonable time after February 17. But for Frenzen's letter precluding the closing of the Taylor-Wetovick sale, Wetovick undoubtedly would have completed purchase of the Taylor farm. Consequently, the condition precedent to enforcement of Frenzen's right to purchase the farm never occurred. Therefore, Frenzen is not entitled to specific performance of his agreement with Taylors. However, Wetovick is entitled to specific performance of his contract with Taylors. For that reason, the decision of the district court is affirmed.

AFFIRMED.