WILLIAM F. WURST AND CARLA M. WURST, APPELLANTS, V. BLUE
RIVER BANK OF MCCOOL JUNCTION, NEBRASKA, APPELLEE.

454 N.W.2d 665

Filed May 4, 1990.    No. 88-313.

Stephen Speicher for appellants.

Stephen H. Nelsen, of Cline, Williams, Wright, Johnson & Oldfather, for appellee.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

SHANAHAN, J.

In an action commenced in the district court for York County, William F. Wurst and Carla M. Wurst contended that the Blue River Bank of McCool Junction, Nebraska (Bank), now the First National Bank of York, had breached a loan agreement by not discharging all of Wursts' indebtedness to the Bank, which had received proceeds from the sale of Wursts' farmland. After a bench trial, the district court dismissed Wursts' action.

## STANDARD OF REVIEW

In a bench trial of a law action, a trial court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous. *Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 390 N.W.2d 487 (1986). In reviewing a judgment awarded in a bench trial of a law action, the Supreme Court does not reweigh evidence but considers the evidence in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Zeller v. County of Howard*, 227 Neb. 667, 419 N.W.2d 654 (1988); *Alliance Nat. Bank v. State Surety Co., supra*; *McKinstry v. County of Cass*, 228 Neb. 733, 424 N.W.2d 322 (1988). *Oddo v. Speedway Scaffold Co.*, 233 Neb. 1, 2, 443 N.W.2d 596, 598-99 (1989). See, also, *Buckingham v. Wray*, 219 Neb. 807, 366 N.W.2d 753 (1985).

## BACKGROUND FOR WURSTS' ACTION

Wursts owned a York County farm, which included 130 acres of irrigated farmland and a 6-acre site for Wursts' residence. Until 1978, William Wurst had farmed the land, but, on account of his severe back problem, was forced to give up farming. Wursts leased their farmland on a cash basis while William tried his hand at selling feed. However, chronic back problems compelled William to give up the feed business.

Over a span of approximately 11 years, Wursts and the Bank had engaged in a business relationship during which K.D. Patitz, manager of the Bank, became well acquainted with Wursts and handled their financial matters. In 1980, William

Wurst approached Patitz about obtaining a business loan to conduct a trucking operation. Wurst wanted to buy one truck, an Aerodyne cab-over model with a V-8 Caterpillar engine, for the proposed trucking business. Since William had no experience in trucking, Patitz advised against a loan for the truck purchase. When Wurst persisted and offered the Wursts' farmland and residence as collateral for a truck loan, he told Patitz that if the Bank would not lend them the money, they would secure financing elsewhere. As the result of Wurst's persuasion, Patitz authorized a bank loan to Wursts, which was sufficient for purchase of a Kenworth truck and commencement of a trucking business. Before making the loan, the amount of which is undisclosed by the record, Patitz warned Wurst that if the trucking business failed, they could lose everything. Sometime in 1981, after Wursts had granted the Bank a mortgage on their farmland and residence, Wursts purchased a Kenworth truck for $76,000 and began their trucking operation.

Although their trucking business became unprofitable, Wursts continually borrowed money from the Bank to meet their business and personal living expenses. In June 1981, Wursts listed the farmland for sale through United Farm Agency, which listing excluded Wursts' residence. Throughout the fall of 1981, Wursts continued to borrow from the Bank to make up for operating deficits from the trucking business. Around November or December 1981, when it became apparent that the 130 acres of farmland were not selling through United Farm Agency, Patitz suggested to Wursts that they take some action to reduce their bank debt, which by February 1982 exceeded $163,000. Of the Wursts' bank debt, $140,000 was attributable to the unprofitable trucking business. On January 13, 1982, Wursts executed a new mortgage for $168,000 to the Bank, covering their farmland and residence as security for the new mortgage. In February 1982, the Bank and Wursts entered into a loan agreement in which the parties acknowledged Wursts' current debt of $163,796.95 to the Bank at the date of February 8, 1982. Also in the loan agreement, the Bank agreed "to the renewal and extension of the present indebtedness, plus the new advance

[$4,203.05] as requested by the borrower." Pursuant to the loan agreement, Wursts signed two promissory notes, one for $150,000 and the other for $13,796.95, which were due on August 2, 1982. Wursts' indebtedness was secured by the January 1982 mortgage, a financing statement covering all agricultural products from Wursts' farm, a motor vehicle lien on the Kenworth truck, and the "[p]ersonal signatures of William F. Wurst and Carla M. Wurst." Additionally, the loan agreement provided:

5. Borrower hereby acknowledges that he has listed for sale his 130 acres of farm real estate located in the Southwest Quarter (SW¼) of Section Twenty-four (24), Township Ten (10) North, Range Three (3), West of the 6th P.M., in York County, Nebraska.

6. It is hereby understood and agreed that if this real estate is not sold by private treaty by June 1, 1982, it will be listed for sale at public auction, with said auction to be held prior to July 1, 1982 and final settlement on the sale of real estate, on or before August 2, 1982.

7. It is further agreed that the proceeds from the sale of the York County real estate will be applied to and will pay the total indebtedness to The Blue River Bank, McCool Junction, Nebraska at the time of final settlement.

When the loan agreement was entered, both the Bank and Wursts believed that the agreement was a means for eventual liquidation of Wursts' assets and reduction of their indebtedness to the Bank. William Wurst told Patitz to do "whatever would be necessary" to pay off the Wurst debts.

From March 1982 through July of that year, the Bank continued to advance funds to Wursts for operating expenses in the trucking business and for their personal expenses. Although the loan agreement provided for a total advance of $4,203.05, by July the Bank had advanced $24,380 to Wursts, which brought Wursts' bank indebtedness to a sum of almost $200,000.

Throughout most of 1982, Carla Wurst suffered "atypical depression," which, according to her psychiatrist, Dr. Robert Osborne, was a "persistent, ongoing, severe depressive disorder," severe enough to impair her ability to make decisions

or solve problems. William Wurst displayed depression but was not treated by Dr. Osborne until December 1982. Dr. Osborne evaluated William Wurst in January 1983. Although Dr. Osborne had no information to indicate that William Wurst was incapable of understanding the nature and effect of his actions when the loan agreement was signed, Dr. Osborne believed that the depression suffered by William Wurst may have affected Wurst's ability to make decisions and rendered Wurst apathetic toward the consequences of the loan agreement.

In July 1982, Wursts' farmland was sold at public auction, which resulted in $170,000 applied to the Wurst indebtedness. Since the proceeds from the farmland sale were insufficient to satisfy Wursts' entire indebtedness reflected on the Bank's records, Patitz suggested that Wursts sell their home or their Kenworth truck. When the promissory notes which Wursts had given pursuant to the loan agreement with the Bank were overdue, Wursts, on September 3, 1982, signed two "extension notes" in the total of $33,796.95. Both notes were due on November 15, 1982. Wursts tried to sell the Kenworth on their own, but their efforts failed. In November 1982, Patitz arranged for the Kenworth to be sold to a local truck dealer. Wursts consented to the sale of their truck, which was sold for $38,750. From the proceeds of the truck sale, $35,056.24 was applied to the two extension promissory notes which Wursts had signed earlier in September 1982. The difference between the truck sale price of $38,750 and the balance of Wursts' bank indebtedness of $35,056.24, namely, the sum of $3,693.76, was delivered to Wursts. As a consequence of the payment from the proceeds of the truck sale, the Bank returned to Wursts all their promissory notes and released all security and collateral pertaining to the Wurst debt.

Wursts had never indicated a lack of understanding concerning their transactions with the Bank, never objected to the various sales or the amounts realized from the sales of their property, and did not object to Patitz' applying any sale proceeds on their indebtedness to the Bank. The Bank was unaware of an alleged problem with the Wurst account until April 1983, when an attorney representing Wursts contacted the

Bank. In April 1985, Wursts filed their damages action against the Bank and claimed that the Bank had failed to carry out paragraph 7 of the loan agreement, which, according to Wursts, required the Bank to release them from all liability for any indebtedness existing after the sale of their farmland and payment of the land sale proceeds to the Bank. Wursts also claimed that there was no consideration for the two "extension notes" executed in September 1982. Wursts further alleged that the Bank forced them to sell the Kenworth truck for less than its fair market value and required them to turn over the proceeds from the truck sale to the Bank when Wursts owed nothing to the Bank. Thus, Wursts sought to recover the amounts paid to the Bank from the sale of the truck, plus the difference between the truck's fair market value and its sale price, a difference of $12,000. Wursts contended that paragraph 7 of the loan agreement, containing the language "the proceeds from the sale of the York County real estate will be applied to and will pay the total indebtedness to [the Bank]," meant that any money received by the Bank from the sale of Wursts' farmland would satisfy their entire indebtedness to the Bank, regardless of the actual amount of the debt at the time of the sale or the amount realized from sale of the farmland. In its answer, inter alia, the Bank generally denied the cause of action alleged by Wursts.

The trial court found that the evidence failed to substantiate Wursts' claim that, by virtue of paragraph 7 of the loan agreement, the sale of Wursts' farmland and the Bank's receipt of proceeds from that sale extinguished all liability for Wursts' indebtedness. In its conclusions, the court stated: "The Loan Agreement, mortgages and subsequent loans were all part of a single continuning [sic] transaction which is evidenced by the [parties'] performance. There was no agreement that the sale of real estate excluding the residence would pay total indebtedness." The court then concluded that Wursts had failed to prove a cause of action against the Bank for a breach of contract and dismissed Wursts' action.

Throughout several assignments of error, Wursts contend, in substance, that the district court erred by disregarding the effect of paragraph 7 of the loan agreement, which stated: "[T]he proceeds from the sale of the York County real estate will be

applied to and will pay the total indebtedness to The Blue River Bank, McCool Junction, Nebraska at the time of final settlement." Wursts argue that the phrase "will pay the total indebtedness" means that their payment to the Bank from the proceeds of the farmland sale operated to discharge their entire indebtedness to the Bank. Also, Wursts assert that each of them lacked the requisite mental capacity to comprehend their promissory notes executed in September 1982 and, further, contend that their extension promissory notes, executed in September 1982, are unsupported by consideration.

## AMBIGUITY IN LOAN AGREEMENT

A court is not free to speculate about terms absent from a written contract. *Craig v. Hastings State Bank*, 221 Neb. 746, 380 N.W.2d 618 (1986). "Where the parties have clearly expressed an intent to accomplish a particular result, it is not the province of a court to rewrite a contract to reflect the court's view of a fair bargain." *Id*. at 750, 380 N.W.2d at 621.

"Ambiguity exists in an instrument when a word, phrase, or provision in the instrument has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings." *Knox v. Cook*, 233 Neb. 387, 391, 446 N.W.2d 1, 4 (1989). See, also, *Dammann v. Litty*, 234 Neb. 664, 452 N.W.2d 522 (1990); *In re Estate of Walker*, 224 Neb. 812, 402 N.W.2d 251 (1987).

"Whether a document is ambiguous is a question of law initially determined by a trial court." *Knox v. Cook, supra* at 391, 446 N.W.2d at 4. See, also, *Dammann v. Litty, supra*; *First Nat. Bank in Mitchell v. Kurtz*, 232 Neb. 254, 440 N.W.2d 432 (1989); *Luschen Bldg. Assn. v. Fleming Cos.*, 226 Neb. 840, 415 N.W.2d 453 (1987).

"Regarding a question of law, an appellate court has an obligation to reach a conclusion independent from a trial court's conclusion in a judgment under review." *Huffman v. Huffman*, 232 Neb. 742, 748, 441 N.W.2d 899, 904 (1989). See, also, *Dammann v. Litty, supra*; *Boisen v. Petersen Flying Serv.*, 222 Neb. 239, 383 N.W.2d 29 (1986).

We find, as a matter of law, that there is ambiguity in the language of paragraph 7 of the Wurst-Bank loan agreement, namely, "the proceeds from the sale of the [farmland] will be

applied to and will pay the total indebtedness." On one hand, the language in question is susceptible to the reasonable interpretation that the Bank's receipt of proceeds from the sale of Wursts' land satisfied and discharged the entire Wurst indebtedness to the Bank. However, the indicated language in the loan agreement may also be reasonably interpreted to mean that the Bank's receipt of the sale proceeds constituted a payment on Wursts' debt and resulted in a credit on any unpaid balance of Wursts' indebtedness existing when the Bank received the sale proceeds.

"When a court has determined that ambiguity exists in a document, an interpretative meaning for the ambiguous word, phrase, or provision in the document is a question of fact for the fact finder." *Dammann v. Litty, supra* at 671, 452 N.W.2d at 527. See, also, *First Nat. Bank in Mitchell v. Kurtz, supra*; *Lueder Constr. Co. v. Lincoln Electric Sys.*, 228 Neb. 707, 424 N.W.2d 126 (1988).

"In attempting to ascertain the meaning of ambiguous terms of a contract, a court must determine the actual intent of the contracting parties, considering facts and circumstances which motivated each party to enter the contract, and the nature and subject matter of the contract." *Frenzen v. Taylor*, 232 Neb. 41, 48, 439 N.W.2d 473, 478 (1989). See, also, *Lauritzen v. Davis*, 214 Neb. 547, 335 N.W.2d 520 (1983); *Lone Oak Farm Corp. v. Riverside Fertilizer*, 229 Neb. 548, 428 N.W.2d 175 (1988).

When construction of a contractual provision is necessary, a court may consider the conduct of the parties, performing their contract, to ascertain the parties' intent regarding their contract. As this court expressed in *Municipal Energy Agency of Neb. v. City of Cambridge*, 230 Neb. 61, 65-66, 430 N.W.2d 44, 47 (1988):

> An aid in interpreting contracts is the course of performance of the parties. In *Smith v. Daub*, 219 Neb. 698, 703, 365 N.W.2d 816, 820 (1985), we held that "in attempting to construe the meaning of a contract . . . the interpretation given a contract by the parties themselves while engaged in the performance of it is one of the best indications of the true intent of the contract, and ordinarily such construction of the contract should be

enforced." See, also, *Lortscher v. Winchell*, 178 Neb. 302, 133 N.W.2d 448 (1965).

In *Omaha P. P. Dist. v. Natkin & Co.*, 193 Neb. 518, 524-25, 227 N.W.2d 864, 868-69 (1975), this court held: "In the construction of questioned provisions in a contract, the rule has long been established in this jurisdiction that the interpretation given to a contract by the parties themselves while engaged in the performance of it is one of the best indications of the true intent of the contract. Ordinarily, such a construction of the contract should be enforced. . . . This is a rule of justice and equity, and we apply it herein. . . ."

See, also, *Nowak v. Burke Energy Corp.*, 227 Neb. 463, 418 N.W.2d 236 (1988); *Smith v. Daub*, 219 Neb. 698, 365 N.W.2d 816 (1985); *Lauritzen v. Davis, supra*; *DeFilipps v. Skinner*, 211 Neb. 801, 320 N.W.2d 737 (1982).

In interpreting a written contract, the meaning of which is in doubt and dispute, the court, in order to determine its meaning, will consider all the facts and circumstances leading up to and attending its execution, and will consider the relation of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract.

*Philp v. First Nat. Bank & Trust Co.*, 212 Neb. 791, 797, 326 N.W.2d 48, 52 (1982). See, also, *Lone Oak Farm Corp. v. Riverside Fertilizer, supra*.

The district court made the factual determination that there was no agreement that the Bank's receipt of proceeds from the sale of Wursts' farmland constituted payment of Wursts' entire indebtedness to the Bank. Embodied in the foregoing conclusion is the district court's determination regarding "the actual intent of the contracting parties, considering facts and circumstances which motivated each party to enter the contract, and the nature and subject matter of the contract." See *Frenzen v. Taylor, supra* at 48, 439 N.W.2d at 478. In determining the meaning of paragraph 7 of the loan agreement, the district court undoubtedly considered the parties' interpretative conduct in relation to performance of the loan agreement. When the proceeds of the farmland sale were

insufficient to satisfy the indebtedness reflected on the Bank's books, Wursts signed two promissory notes for the balance of the indebtedness—conduct which was inconsistent with the later assertion that proceeds from the farmland sale extinguished all their indebtedness to the Bank. The district court most likely concluded that if Wursts' indebtedness were to be extinguished by the farmland sale and the sale proceeds paid to the Bank, Wursts would not have signed the promissory notes in September 1982. Thus, Wursts' extension promissory notes in September 1982, reflecting an unpaid debt of $33,796.95 to the Bank, presented a factual inconsistency concerning Wursts' assertion that the parties intended to extinguish Wursts' entire indebtedness as the result of the Bank's receipt of proceeds from the farmland sale in the preceding July. Moreover, Wursts' allowing the Bank to receive the proceeds from the truck sale arranged by the Bank and retain $35,056.24 out of the sale proceeds, without objection until almost 6 months after the sale and the disposition of sale proceeds, undermines Wursts' position that no indebtedness existed after the farmland sale. Given the ambiguity in the loan agreement, the district court's factual determination regarding the intended meaning of the loan agreement is not clearly erroneous.

## MENTAL CAPACITY

Wursts assert that the district court erred in its finding that each of the Wursts had the requisite mental capacity to execute the extension notes of September 1982.

> [F]or want of mental capacity on the part of the person executing such instruments, the burden of proof is upon the party so asserting to establish that the mind of the person executing such instruments was so weak or unbalanced when the instruments were executed that he could not understand and comprehend the purport and effect of what he was doing.

*Dunbier v. Rafert*, 170 Neb. 570, 589, 103 N.W.2d 814, 827 (1960). Therefore, one asserting lack of requisite mental capacity in relation to an instrument has the burden to prove such lack of mental capacity.

As a factual determination, the district court concluded that Wursts failed to establish any deficiency in their mental capacity regarding the extension notes, a conclusion which is not clearly erroneous.

## CONSIDERATION

Wursts' contention that their September 1982 promissory notes lacked consideration is without merit. Extension of time to pay a mature and valid debt is sufficient consideration to support a promise to pay the debt at the later date. *Victoria Bank & Trust Co. v. Brady*, 779 S.W.2d 893 (Tex. App. 1989); *Hammel v. Ziegler Financing Corp.*, 113 Wis. 2d 73, 334 N.W.2d 913 (1983). See, also, *Hasenauer v. Durbin*, 216 Neb. 714, 346 N.W.2d 695 (1984) (contract consideration is sufficient if there is any detriment to the promisee or benefit to the promisor). As a result of the undisputed facts, we conclude, as a matter of law, that adequate consideration supported Wursts' extension notes of September 1982. Hence, the district court's decision concerning consideration is correct.

We are unable to conclude that any finding by the district court is clearly erroneous. For that reason, the district court's judgment is affirmed.

AFFIRMED.