MICHAEL D. KOZLIK, APPELLEE, V. EMELCO, INC., A NEBRASKA CORPORATION, APPELLANT.

483 N.W.2d 114

Filed April 23, 1992.   No. S-89-885.

Daniel P. Chesire and Raymond E. Walden, of Kennedy, Holland, DeLacy & Svoboda, for appellant.

Edward F. Pohren, of Dwyer, Pohren, Wood, Heavey & Grimm, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

In the bifurcated trial of this declaratory judgment action to determine the rights of the parties under a contract of employment, the jury determined that the defendant-appellant

employer, Emelco, Inc., had discharged the plaintiff-appellee employee, Michael D. Kozlik, without cause. The trial judge thereafter assessed the employee's damages at $265,397.51.

## FACTS

Emelco is a Nebraska corporation engaged in the business of leasing medical equipment to Helget, Inc., another Nebraska corporation, which operates home health care divisions in Omaha, Lincoln, Des Moines, Iowa City, and Houston. Both corporations are owned by Eugene K. Helget, who serves as Emelco's president.

Kozlik began working for a certified public accountancy firm in 1978 while attending law school and became a full-time employee after his graduation in 1979. He started as a tax specialist and advanced rapidly, becoming a manager within 4 years.

Helget, Inc., was a client of the accountancy firm, and it was through this association that Helget and Kozlik became acquainted in July 1981. Within a few days of their introduction, Helget approached Kozlik about coming to work for him, but Kozlik rejected the invitation. Over the next 3 years, Kozlik performed numerous accounting services for Helget, Inc., Emelco, and Helget personally. In 1982, the accountancy firm put Kozlik in charge of the Helget "enterprises" account, which was considered to be a significant item of business.

Helget continued to extend several invitations of employment to Kozlik. Kozlik testified that Helget "asked me no less than annually and I would say probably five to ten times between July of '81 up through March of '84 if I would go to work for him . . . ." Kozlik politely declined each offer with the explanation that he had a good job and that he was happy where he was. However, in March 1984, Helget spoke of doubling Kozlik's salary and Kozlik became interested.

Helget told Kozlik that he was interested in retiring within 2 to 4 years and that, as he wanted to get his children out of Helget, Inc., and into their own businesses, he wanted to train someone to take over the business. Helget also wanted to leave Helget, Inc., in good hands so that he could be assured of a

continued retirement income from business earnings.

In May 1984, Kozlik told Helget that as this was a family business, he was concerned that Helget's children might look unfavorably on a nonfamily member assuming a managerial role. In addition, Kozlik spoke about the risks he would be taking should he leave his position as a certified public accountant and thereby abandon his clients. Kozlik told Helget that in light of this, he would need to have a written employment contract. Kozlik also asked Helget to speak with his children about the plan to have a nonfamily member assume a managerial role.

At their next meeting in June, Helget outlined some of his goals and objectives and spoke of the general duties that Kozlik would have within the corporation. Helget said that he planned to appoint Kozlik vice president of Helget, Inc., but as Helget had not yet spoken with his children, no specific provisions of the proposed contract were discussed.

In late June, after Helget had met with his children, a meeting was held to discuss contract specifics. At this time, Helget informed Kozlik that he had changed his mind and that Kozlik was to be vice president of Emelco rather than of Helget, Inc. Kozlik was generally amenable to this change.

According to Kozlik, the provisions regarding termination of his employment were discussed several times. Kozlik had communicated to Helget that undertaking this employment involved significant personal risk and sacrifice. He again stressed his concern over being a nonfamily member and "losing out" should he find himself in disagreement with other family members. In light of this concern, Helget agreed to restrict the ways in which Kozlik could be discharged, but indicated that at the same time he wanted to be able to terminate Kozlik with ease should family problems arise. Kozlik informed Helget that he did not object to this, but reminded Helget of how much Kozlik was giving up by going to work for Helget. Based on these concerns, they negotiated two separate policies regarding termination, which are contained in two paragraphs of the written 5-year employment contract executed on July 30, 1984. The first of these paragraphs provides that Kozlik may be terminated for "cause," defined as consisting of "gross

negligence or willfull [sic] misconduct," in which event Kozlik would receive no further compensation.

The second of these paragraphs sets forth the terms and conditions of termination "without cause." One clause of this paragraph permits Kozlik to terminate employment upon 30 days' notice, in which event Kozlik would receive compensation only to the date of termination. Another clause permits Emelco to terminate the contract without cause, in which event Emelco would be obligated to pay Kozlik "his regular salary . . . until the employment term shall expire on June 30, 1989." Helget personally guaranteed Emelco's obligations under the contract.

Kozlik began working for Emelco in August 1984. On October 2, 1984, Kozlik was appointed vice president of finance for Helget, Inc. Since the business viability of Emelco was dependent on the success of Helget, Inc., Kozlik was of the view, and Helget agreed, that it was necessary for Kozlik to have authority over the operations of Helget, Inc.

Although Helget initially considered Kozlik to be doing a good job, he later changed his mind. Three events bear on this change.

The first centers on problems Helget, Inc., experienced with certain liquid oxygen reservoirs Helget had purchased from Union Carbide Corporation. The manager of Helget, Inc.'s Omaha home care office, Thomas Spain, wrote a letter to U.S. Pharmacopeia (USP), reporting that the reservoirs were not delivering the required amount of oxygen. USP is an organization composed of those involved in the health sciences and related industries who help determine applicable industry standards. As a reporter for USP, Spain was required to notify it about problems found in a medical device or product. USP would then notify the manufacturer and the Food and Drug Administration (FDA).

In response to the concerns raised about its reservoirs, Union Carbide sent replacement parts and wrote Helget that it would work with his company to resolve the problem. A Union Carbide letter dated June 24, 1985, to Helget, Inc., outlined Union Carbide's plan for its "voluntary corrective action recall," and indicated that there was an August 19, 1985, deadline for completion of the repair work. Although it had

initially been decided that Union Carbide employees would make the repairs, subsequent communications establish that the Helget, Inc., employees would make them and bill Union Carbide for labor at a specified rate.

Sometime in August, Kozlik became aware that the August 19 deadline might be extended to October. In a memorandum dated September 25, 1985, to Helget, Inc.'s division managers, including Spain, Kozlik reminded the workers that the filter replacement had to be completed. The memorandum stated, in relevant part:

> In July you were all sent a number of filters that need to be inserted into the Union Carbide reservoirs. Per order from the FDA all . . . of the reservoirs we have will have to have that modification completed by October 15, 1985. Each manager will be sent an FDA form to sign (under penalty of perjury) that the filters have been instaled [sic]. Please have this done by that date.

According to Kozlik, the information regarding the FDA form, as well as the October 15 deadline, was received through conversations with representatives of Union Carbide. Spain claims that he never received the September 25 memorandum.

The evidence shows that up until the first part of October, Kozlik was still under the impression that he would receive an FDA form. A few days prior to the October 15 deadline, Kozlik discovered, through a telephone conversation with Union Carbide, that there was no official form forthcoming, and he was requested to draft one himself. Union Carbide advised him that the form was to contain language to the effect that the statement was being made "under penalty of perjury." According to Kozlik, Union Carbide

> said they needed some language in the guarantee form that would be binding, something that they could show to the Food and Drug Administration that there is a certification that the work had been done, and we had talked a little bit about what types of language would be appropriate, and they had mentioned, they kept bringing up the penalty of perjury.

On October 17, 1985, Kozlik sent another memorandum to the division managers. It advised that repairs were to have been

completed by October 15, 1985, and requested that each manager sign a guarantee of performance form, stating that the repairs had been completed. The form read:

October 15, 1985

GUARANTEE OF PERFORMANCE
HELGET, INC.

I do guarantee, under penalty of perjury, that all of the Union Carbide reservoirs that are being used by my patients or are unused and in my control have been modified by installing the filters that were supplied by Union Carbide Corp.

Upon receipt of the form, some of the managers complained about the perjury language. Kozlik relayed these concerns to Union Carbide and was told that a "toned down" version would be acceptable. Kozlik then drafted a revised form, reading:

October 15, 1985

Guarantee of Performance
HELGET, INC.

I do guarantee that, to the best of my knowledge and belief, all of the Union Carbide reservoirs that are being used by my patients or are unused and are under my control have been modified by installing the filters that were supplied by the Union Carbide Corporation.

Kozlik testified that he drafted this revised form sometime around October 22 and placed a copy of it on Spain's desk with a note, saying: "Tom: Attached is a less 'scary' statement. It has the same implications but different language." Although Kozlik had never visited with Spain about the original form, he thought that in light of the other managers' concerns, Spain might have similar concerns, and Kozlik wanted to give him the same opportunity to sign the revised form as he was giving the other managers.

Spain testified that in response to Kozlik's original form, he consulted his attorney and wrote Kozlik that he (Spain) would not sign it, since he had no personal knowledge that the work had been done and signing it would expose him to liability. Upon receiving this communication, Kozlik became angry and sent Spain a memorandum telling him to "[g]et it done & sign

the paper I gave you." Kozlik testified that he was referring to the revised form. After receiving the latest Kozlik memorandum, Spain once again sought his attorney's advice and thereafter submitted his resignation to Helget. Spain's resignation was not accepted, and he continued with his managerial duties.

Kozlik testified that Helget had never indicated to him that the Union Carbide matter had been handled incorrectly, stating that, on the contrary, Helget had "congratulated" him. Helget acknowledged that he had never told Kozlik that he was dissatisfied with the way the matter had been handled. Nonetheless, Helget testified that he was very disappointed when he learned of what he characterized as Kozlik's attempt to have the managers perjure themselves, saying: "I really was disappointed. Here was a man with all the credentials in the world . . . and now I find out that he asks an employee well down the line, a manager, to commit perjury. That really hurt."

The second major event on which Helget relies as proof that Kozlik was grossly negligent and engaged in willful misconduct involves the afterhours use of the office and telephones. In a memorandum dated April 21, 1986, Kozlik wrote Helget that he wanted to use the office telephones in the evening for a political campaign in which his father-in-law was involved. Kozlik wrote that he would ask Spain and George Johnson, a manager with Helget hospital sales, if that would be acceptable to them and that Helget should let Kozlik know if he had any objection. Helget denied that he ever received such a memorandum, but Johnson testified that Kozlik had asked him for permission to use the office for canvassing. Johnson stated that he saw no problem with it and even volunteered to "take the rap for it" if Helget were to become angry. However, prior to Kozlik's use of the telephones, Johnson spoke personally with Helget, who said that he had no problem with that.

On the first night of canvassing, Jean Soares, the bookkeeper and a 13-year employee of Helget's, was in the office. She confronted Kozlik regarding the use of the office, to which Kozlik responded that he had received permission from the managers. It was not until after the fact that Helget complained about the use of the office for political purposes,

claiming that as a result of such use, he sent a letter dated May 9, 1986, to Kozlik revoking all authority he had been given in 1984 and telling Kozlik that he would be given assignments on a day-to-day basis. Helget never thereafter gave any assignments to Kozlik.

The third event occurred in the spring of 1986, when Kozlik informed Spain that he had received a call from the Omaha office of the Federal Communications Commission (FCC) complaining about the use of profane language on Helget, Inc.'s two-way truck radios. Spain told Kozlik that he "found that hard to believe, for one, that they would call on a Saturday and that it sounded strange," but nevertheless offered to check with the drivers. Kozlik was not able to identify the FCC caller or offer further information about the call. Spain never received any written complaints from the FCC, and shortly thereafter, the issue was dropped, never being raised again between Kozlik and Spain.

However, on June 6, 1986, Helget left a message with an employee, asking Kozlik to give him the name of the person he talked with at the FCC. There was no other discussion between Helget and Kozlik about the FCC affair.

Kozlik contends he was dismissed not for cause but because the financial condition of Helget, Inc., had deteriorated to such a point that it was no longer feasible for the company to pay his salary. The contract provides that Kozlik be paid $65,000 the first year, $75,000 the second year, $85,000 the third year, $95,000 the fourth year, and $100,000 the fifth year.

A June 1986 financial report showed that Helget, Inc., had lost money at all of its offices, except one in Omaha. Kozlik wrote Helget a number of memorandums calling into question a variety of matters. On April 5, 1985, Kozlik warned that a hospital's contract with Helget, Inc., was in jeopardy because of poor service; on May 10, 1985, Kozlik argued that entering into another business venture without first solidifying Helget, Inc., would be detrimental, and pointed out that Helget, Inc., had not made a profit in 3 years; on October 10, 1985, Kozlik questioned Helget about a 1-month $12,000 loss at the Kansas City gas products company run by one of Helget's sons, but financed by Helget; on December 27, 1985, Kozlik projected

that Emelco would lose approximately $50,000 a month in 1986; and an August 9, 1986, memorandum from Kozlik noted that the Omaha office had only one backup ventilator, a situation which would create problems if new ones were not purchased.

According to Kozlik, Helget thwarted any attempts he made to bring the company into profitability. Often, Helget would propose plans that were in direct conflict with the financial health of the company. For example, Helget attempted to expand into other businesses at the expense of Helget, Inc.; continued to subsidize his son's unprofitable operation in Kansas City with financial resources critical to Helget, Inc.; allowed apparently incompetent and rude people to hold critical positions; and considered investing in a software program that had little value. Helget very seldom sat down with Kozlik to discuss a strategy; rather, Helget refused to exercise any authority or demand greater accountability from his employees.

After Helget revoked Kozlik's authority on May 9, 1986, Kozlik continued to write memorandums to Helget about business matters and about his role. Finally, in an August 15, 1986, memorandum, Kozlik referred to a conversation he had had with Helget. Apparently for the first time, Helget told Kozlik in their conversation that he was thinking of terminating him for cause. On August 25, 1986, Helget sent Kozlik a letter terminating his employment "for gross negligence and willful misconduct that occurred during your term of employment." Helget claims that it was the Union Carbide problem, the campaign use of the office, and the FCC matter which led him to dismiss Kozlik.

At Helget's suggestion, Kozlik had allowed his certified public accountancy license to lapse, and after the termination of his employment, he began to practice law. He earned $109,519.50 at this endeavor during the period from the termination of his employment to the end of the contract term.

## ASSIGNMENTS OF ERROR

Emelco's assignments of error combine to claim that the trial judge erred in (1) failing to grant Emelco's motion for new trial

and (2) failing to offset Kozlik's posttermination earnings against the amount due under the contract.

## DENIAL OF NEW TRIAL

The first assignment claims, in essence, that the trial judge erred in not granting Emelco a new trial because, as the consequence of Kozlik's change in testimony "to meet the necessities of the case," the verdict is "contrary to the facts."

It is true, as Emelco argues, that where a party clearly changes his or her deposition testimony at trial on a point vital to the case in order to meet the exigencies of the trial and no rational or sufficient explanation of the change exists, the trial testimony stands discredited as a matter of law, and the party is bound by the admissions made at the deposition. *State v. Robertson*, 223 Neb. 825, 394 N.W.2d 635 (1986); *Nixon v. Harkins*, 220 Neb. 286, 369 N.W.2d 625 (1985); *Momsen v. Nebraska Methodist Hospital*, 210 Neb. 45, 313 N.W.2d 208 (1981).

At the taking of his deposition, Kozlik was asked, " 'Do you remember if you used the terms when you wrote to [Spain] to sign the modified version that it contained language that was . . . less scary . . . ?' " Kozlik replied, " 'I don't recall.' " As reflected earlier, Kozlik testified at trial that he put the revised form on Spain's desk sometime around October 22, 1985, with an accompanying memorandum declaring that the revised form was "less scary" than the original form.

It is obvious, however, that the focus of the question asked at the deposition is not the same as the gravamen of the testimony offered at trial. At the deposition, the inquiry was directed toward whether the phrase "less scary" had been used; the focus of the trial testimony was not on the words used but on Kozlik's having placed a revised form on Spain's desk and when he had done so.

True, Kozlik read to the jury the accompanying memorandum, which declares that the attached form is "less scary." However, that testimony hardly qualifies as an unexplained change to meet the exigencies of the trial. Kozlik quite reasonably explained that at the time his deposition was taken, the accompanying memorandum was not given to him

and that upon later seeing the document, his memory as to the language used was refreshed.

Under the circumstances, it cannot be said that Kozlik's trial testimony was discredited as a matter of law; it therefore follows that the trial judge did not err in refusing Emelco a new trial.

## DENIAL OF OFFSET

As noted earlier, with regard to the second assignment of error, Emelco urges that the trial judge erred in assessing Kozlik's damages by failing to offset Kozlik's posttermination earnings against the amount otherwise due under the contract because the termination without cause damages language is not applicable, and if it is applicable, it imposes an unenforceable penalty.

*Applicability of Language.*

In essence, Emelco contends that the concept of stipulated damages does not apply to employment contracts. It is true, as Emelco argues, that, ordinarily, "the measure of damages in a suit for breach of an employment contract for personal services is the amount of salary agreed upon for the period involved, less the amount which the servant earned, or with reasonable diligence might have earned, from other employment." *Stiles v. Skylark Meats, Inc.*, 231 Neb. 863, 867, 438 N.W.2d 494, 498 (1989). It is equally true, however, that parties to a contract may override the application of the judicial remedy for breach of a contract by stipulating, in advance, to the sum to be paid in the event of a breach. See, *U.S.D. No. 315 v. DeWerff*, 6 Kan. App. 2d 77, 626 P.2d 1206 (1981); *American Institute of Marketing Sys., Inc. v. Keith*, 82 N.M. 699, 487 P.2d 127 (1971). This court has consistently upheld the right of contracting parties to privately bargain for the amount of damages to be paid in the event of a breach of contract, provided the stipulated sum is reasonable in light of the circumstances. *Crowley v. McCoy*, 234 Neb. 88, 449 N.W.2d 221 (1989); *Bando v. Cole*, 197 Neb. 722, 250 N.W.2d 651 (1977); *Growney v. C M H Real Estate Co.*, 195 Neb. 398, 238 N.W.2d 240 (1976).

Nonetheless, Emelco argues that the provision requiring it to pay Kozlik his regular salary upon a termination without cause

"should be interpreted as a partial statement of the legal measure of damages for breach of an employment contract, rather than as an expression of intent by the parties to wholly replace the legal measure with a remedy of the parties' own devising" and that, therefore, the trial judge should have applied the general legal remedy for breach with an offset of Kozlik's subsequent earnings.

However, the relevant contract language is plain and unambiguous. It clearly specifies what Kozlik's damages were to be in the event that his employment was terminated without cause; nowhere does the contract suggest that those damages were to be reduced by the amount of his posttermination earnings. A court is not free to speculate about terms absent from a written contract; where the parties have clearly expressed an intent to accomplish a particular result, it is not the province of a court to rewrite a contract to reflect the court's view of a fair bargain. *Wurst v. Blue River Bank*, 235 Neb. 197, 454 N.W.2d 665 (1990). More specifically, a court is not free to rewrite a contract so as to provide terms contrary to those which are expressed. See *Kansas-Nebraska Nat. Gas Co. v. Swanson Bros.*, 215 Neb. 398, 338 N.W.2d 774 (1983).

The subject language is a bargained-for contractual provision, which is as applicable to employment contracts as to other contracts. Although in retrospect Helget may be dissatisfied with the bargain he made, it is not for this court to rewrite the contract he executed.

### Enforceability of Language.

As we have concluded that the concept of stipulated damages is applicable to employment contracts, the next question is whether the amount stipulated constitutes liquidated damages and is thus enforceable, or whether it imposes a penalty and is thus unenforceable. Emelco contends that a stipulated damages provision in an employment contract which fails to provide for an offset of posttermination earnings is unreasonable and is therefore an unenforceable penalty.

In *Growney*, 195 Neb. at 401, 238 N.W.2d at 242-43, we held:

"The question of whether a stipulated sum is for a penalty or for liquidated damages is answered by the application

of one or more aspects of the following rule: a stipulated sum is for liquidated damages only (1) where the damages which the parties might reasonably anticipate are difficult to ascertain because of their indefiniteness or uncertainty and (2) where the amount stipulated is either a reasonable estimate of the damages which would probably be caused by a breach *or* is reasonably proportionate to the damages which have actually been caused by the breach."

(Emphasis in original.) See, also, *Bando v. Cole, supra.*

Further explanation is found in *Stanford Motor Co. v. Westman*, 151 Neb. 850, 858, 39 N.W.2d 841, 846 (1949), quoting *Yant Construction Co. v. Village of Campbell*, 123 Neb. 360, 243 N.W. 77 (1932):

"If the damages arising from a breach of the contract are difficult of ascertainment or admeasurement, and if the stipulated amount is not disproportionate to the amount of damages that may be reasonably anticipated from the breach, it will usually be regarded as a provision for liquidated damages. On the other hand, if the damages may be easily and readily ascertained, and if the amount stipulated is more than sufficient to compensate for the breach, it will be regarded as a penalty."

Although both of the foregoing quotations focus on the reasonableness of the stipulated damages with regard to an anticipated breach of purchase contracts, we can discern no reason not to apply the same principles to employment contracts.

As noted earlier, the reasonableness of the stipulated damages can be judged as of the time the contract was formed. *Growney v. C M H Real Estate Co., supra.* The evidence demonstrates that as of that time the parties were concerned about protecting Kozlik from the early termination of his employment in view of the client base he had developed and the opportunities available to him in his position with the accountancy firm. As noted in *Waasenaar v. Panos*, 111 Wis. 2d 518, 331 N.W.2d 357 (1983), a discharged employee may suffer permanent injury to professional reputation, as well as loss of career development opportunities.

Under the circumstances, the stipulated damages were

reasonable when the contract was formed, and the trial court correctly upheld them as liquidated damages.

### ORDER

For the foregoing reasons, the judgment of the trial judge is affirmed.

AFFIRMED.

CAPORALE, J., not participating in the decision.

SHANAHAN, J., not participating.