755 N.W.2d 400 (2008)
276 Neb. 559
PAVERS, INC., a Nebraska corporation, Appellee and Cross-Appellant,
v.
BOARD OF REGENTS OF the UNIVERSITY OF NEBRASKA, a public body corporate of the State of Nebraska, Appellant and Cross-Appellee.
No. S-07-671.
Supreme Court of Nebraska.
September 12, 2008.
*402 Craig C. Dirrim and Terry C. Dougherty, of Woods & Aitken, L.L.P., Lincoln, and John C. Wiltse, Senior Associate General Counsel, University of Nebraska, for appellant.
Timothy R. Engler, Adam J. Prochaska, and John Selzer, of Harding & Schultz, P.C., L.L.O., Lincoln, for appellee.
WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ., and SIEVERS and MOORE, Judges.
WRIGHT, J.

I. NATURE OF CASE
This is a contract claim by Pavers, Inc., against the Board of Regents of the University of Nebraska (University). The dispute involves a contract for the performance of earthwork for a student housing project at 16th and Y Streets in Lincoln, Nebraska. The contract was composed of several documents prepared by the University, and the bid included price quotes for 11 separate construction activities.
While Pavers was performing the contract, it became apparent that 3 of the 11 activities would greatly exceed the estimated costs as set forth in the contract. Upon completion of the contract, the University paid Pavers what the University considered to be a reasonable amount, but did not pay the additional amount Pavers claimed for soil disposal, seepage water removal, and seepage water disposal.
Pavers filed a claim with the State Claims Board but then withdrew its claim and initiated an action in the Lancaster County District Court. The matter proceeded to trial, and the court awarded Pavers a judgment on its claim against the University. The University has appealed, and Pavers has cross-appealed.

II. SCOPE OF REVIEW
[1] Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to *403 reach a conclusion independent of the decision reached by the court below. Stenger v. Department of Motor Vehicles, 274 Neb. 819, 743 N.W.2d 758 (2008).
[2, 3] The interpretation of a contract involves a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below. State ex rel. Bruning v. R.J. Reynolds Tobacco Co., 275 Neb. 310, 746 N.W.2d 672 (2008). The meaning of a contract and whether a contract is ambiguous are questions of law. Kluver v. Deaver, 271 Neb. 595, 714 N.W.2d 1 (2006).
[4, 5] In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous. Henriksen v. Gleason, 263 Neb. 840, 643 N.W.2d 652 (2002). The appellate court does not reweigh the evidence but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. Id.

III. FACTS
The University and Pavers contracted for earthwork, grading, and overexcavation for a student housing project at 16th and Y Streets in Lincoln. There were 11 separate construction activities in the contract. The University's bid proposal form described and specified a quantity for each activity. The contractors bid a unit price for each quantity of work. In order to obtain an estimate for each activity, the unit prices bid on the activity were multiplied by the University's estimated quantity of work for the respective activity. The estimates for all 11 activities were added together to arrive at the "Base Bid."
The dispute in this case involves three activities within the contract: soil disposal, seepage water removal, and seepage water disposal. Pavers bid a unit price of $27.60 per ton for soil disposal, which is referred to as "work unit 9." It bid $3.90 per gallon for removal of seepage water, which is referred to as "work unit 10," and $3.45 per gallon for seepage water disposal, which is referred to as "work unit 11."
During the performance of the contract, the actual quantities of seepage water and contaminated soil to be removed and disposed of greatly exceeded the amounts estimated by the University. The contract estimated that Pavers would dispose of 1,400 tons of soil, whereas the actual amount disposed of was 8,071.29 tons. The contract estimated that Pavers would remove and dispose of 1,200 gallons of seepage water, whereas the actual amount removed and disposed of was 173,900 gallons. Pavers claimed that these overruns increased the amounts due under the contract by $184,127.60 for soil disposal, $673,530 for seepage water removal, and $595,815 for seepage water disposal.
On November 5, 2003, Pavers faxed a letter to the University's consultant stating that Pavers was experiencing substantial over-runs in the removal of the contaminated materials. However, Pavers did not submit a "Change Order" for these overruns until after the project was completed. The University's lead project manager, Tracy Aksamit, testified that it was anticipated at the outset that a change order would be issued after the project was over in order to take into account any increases or decreases in quantities. Aksamit stated that it was not necessary for Pavers to submit a change order before doing the work.
The district court found that "[t]he University's consultant and inspector" were aware of the cost overruns because they *404 were on the project site regularly. It further found that despite having knowledge of the overruns, the University instructed Pavers to proceed with the work because the project needed to be completed as quickly as possible.
Based on the unit prices submitted in its bid and the quantities of work performed, Pavers sought payment in the total amount of $1,714,996.40. However, based on its interpretation of the contract, the University did not pay the unit prices bid by Pavers for work units 9 through 11. Instead, the University paid a total of $379,336.54, which it claimed was fair and equitable for the work done on the contract.
Pavers filed a claim with the State Claims Board to compel full payment. The board notified Pavers that pursuant to Neb.Rev.Stat. § 81-8,305 (Reissue 2003), either party could object in writing to submission of the dispute to the board and initiate an action in the district court for Lancaster County. Pavers then filed a written objection to submission of the dispute to the board and initiated this breach of contract action in the district court.
The University moved to dismiss, claiming that § 81-8,305 is unconstitutional because it allows a claimant to initiate an action in the district court in violation of article VIII, § 9, of the Nebraska Constitution. The court found the statute to be constitutional, and the University's motion was overruled.
The matter was tried to the court, and the issue was whether the unit prices for work units 9 through 11 should be equitably adjusted due to the overruns associated with these work units. The district court applied a total cost method of adjustment to the contract price. It awarded Pavers $1,009,773.52, which was the difference between Pavers' total costs of $1,389,110.06 and the amount paid of $379,336.54.
The University has appealed the district court's determination that § 81-8,305 is constitutional and the award of $1,009,773.52 to Pavers. Pavers has cross-appealed and seeks an award for the full amount of the contract in the sum of $1,714,996.40 minus the amount already paid.

IV. ASSIGNMENTS OF ERROR
The University assigns as error, summarized and restated, that the district court erred in finding that § 81-8,305 is constitutional and that Pavers was entitled to recover under the total cost method of damages, in applying the contract's equitable adjustment provision to all of the contract work items, and in failing to limit the adjustment to work units 9 through 11. Pavers cross-appeals that the district court erred in limiting its damages.

V. ANALYSIS

1. CONSTITUTIONALITY OF STATUTE
[6-8] We first address the constitutionality of § 81-8,305, and the following legal principles guide our review: A statute is presumed to be constitutional, and all reasonable doubts will be resolved in favor of its constitutionality. Stenger v. Department of Motor Vehicles, 274 Neb. 819, 743 N.W.2d 758 (2008). The burden of establishing the unconstitutionality of a statute is on the one attacking its validity. Id. Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision reached by the court below. Id.
Section 81-8,305 provides:
(1) If agreed to by the claimant and the contracting agency, the State Claims *405 Board shall have the authority to consider, ascertain, adjust, compromise, settle, determine, or allow any contract claim. Upon receipt of a contract claim, the Risk Manager shall immediately notify the claimant and the contracting agency of the option of having the dispute submitted to the State Claims Board.
(2) If the claimant and the contracting agency agree to submit the dispute to the State Claims Board as provided in subsection (1) of this section, the board shall resolve such dispute in the manner provided under the State Miscellaneous Claims Act. For claims submitted to the board under this subsection, the contracting agency shall provide the board with all documents and information relating to the claim which the contracting agency obtained during its investigation.
(3) If either the claimant or the contracting agency objects in writing to submission of the dispute to the State Claims Board within ninety days of mailing of the notice required in subsection (1) of this section, the board shall have no further jurisdiction over the claim and the claimant may initiate an action in the district court of Lancaster County.
The University contends that § 81-8,305 violates the plain language of article VIII, § 9, of the Nebraska Constitution, which states:
The Legislature shall provide by law that all claims upon the treasury shall be examined and adjusted as the Legislature may provide before any warrant for the amount allowed shall be drawn. Any party aggrieved by the action taken on a claim in which he has an interest may appeal to the district court.
The University argues § 81-8,305 is unconstitutional, because it allows a claimant to bypass the constitutional requirement that all claims against the State shall be examined and adjusted and allows the claimant to file a direct action against the State in the district court for Lancaster County. It contends that the constitution prohibits direct actions and that claims against the State may come to the district court only by way of appeal.
We are required to reach our determination of the constitutionality of § 81-8,305 independently of the decision reached by the trial court. See Stenger v. Department of Motor Vehicles, 274 Neb. 819, 743 N.W.2d 758 (2008). Although article VIII, § 9, requires that all claims upon the treasury be examined and adjusted before any warrant in the amount allowed is drawn, it also grants the Legislature authority to provide the method for examination and adjustment of the claim. By virtue of § 81-8,305, the Legislature has given the State Claims Board the authority to adjust, determine, or allow any contract claim. However, under § 81-8,305, the Legislature has also provided that if either the claimant or the contracting agency objects to submission of the dispute to the State Claims Board, the claimant may initiate an action in the Lancaster County District Court. This is another method by which the claim may be examined and adjusted.
We find nothing in article VIII, § 9, which limits a claimant's right to have the claim examined and adjusted by the district court. This is consistent with article V, § 22, of the Nebraska Constitution, which provides: "The state may sue and be sued, and the Legislature shall provide by law in what manner and in what courts suits shall be brought." Article VIII, § 9, confers authority upon the Legislature to determine how a claim upon the treasury shall be examined and adjusted. The only limitation set forth in article VIII, § 9, is that all claims must be examined and adjusted before any warrant shall be drawn.
*406 The University argues that the phrase "may appeal to the district court" in article VIII, § 9, presumes that a litigant cannot initiate an action in the district court. We disagree. The constitution does not mandate that an aggrieved party must have its claim adjudicated by the State Claims Board before bringing suit in the district court. The claimant is given the right to appeal a decision of the State Claims Board to the district court, but that is not a limitation on how the claim shall be examined and adjusted.
The cases relied upon by the University involved constitutional provisions that did not specifically grant the Legislature authority to determine how claims were to be examined and adjusted. Prior to its amendment in 1964, article VIII, § 9, mandated that "all claims upon the treasury, shall be examined and adjusted by the auditor, and approved by the secretary of state, before any warrant for the amount allowed shall be drawn." See 1963 Neb. Laws, ch. 302, § 2(3), p. 896. This section contained a specific limitation that claims "be examined and adjusted by the auditor, and approved by the secretary of state." Now, article VIII, § 9, delegates to the Legislature the authority to determine how claims on the treasury are to be examined and adjusted.
Having concluded that § 81-8,305 is constitutional, we proceed with the remaining issue: whether there should be an equitable adjustment of the contract and, if so, by what method.

2. CONTRACT DISPUTE

(a) Pavers' Claim
Pavers contracted with the University to perform earthwork (overexcavation and backfill), add crushed rock for stabilization, construct a chain link fence and a silt fence, clear the site, remove contaminated soil, and remove and dispose of seepage water. The project proceeded without any major changes to the type of construction activities, and most of the work was completed by the end of 2003.
For each work unit, the University bid proposal form contained an estimated quantity. Pavers submitted a unit price based on the quantity set forth on the bid proposal form. The form stated that the contract could be modified by change orders which increased or decreased the "Contract Sum" by the actual quantities for each of the work units.
Substantial overruns on the University project were experienced for the disposal of soil and the removal and disposal of seepage water (work units 9 through 11). The actual amount of soil disposed of was 8,071.29 tons, compared to the estimate of 1,400 tons. The actual seepage water removed and disposed of was 173,900 gallons, compared to the estimate of 1,200 gallons.
As the project progressed, Pavers notified the University of the overruns. By fax, Pavers notified Aksamit, the lead project manager, and the University's consultant of the substantial overruns on work units 9 through 11. The University was also aware that cost overruns were occurring, because its lead project manager and its consultant were regularly on the project site. Without requiring a change order for work units 9 through 11, the University told Pavers to continue working on the project, even though the University knew that large quantity overruns, and therefore substantial increases in cost, were imminent. The University instructed Pavers to proceed with the work despite these overruns because the project needed to be completed as soon as possible.
During the course of the project, Pavers maintained detailed records of its expenses, including labor costs, disposal fees, subcontractor charges, trucking expenses, *407 and miscellaneous costs (crushed rock, fuel, and incidentals). Pavers did not keep a separate record of the expenses for each work unit, nor was it required by the contract to do so. The only cost documentation required by the contract for a separate work unit was a record of the soil disposal costs and the seepage water disposal costs associated with the landfill and the water treatment facility.
Pavers submitted a total claim of $1,714,996.40 for the work performed, which included the cost of the large overruns of quantity on work units 9 through 11. Pavers asserted that the contract required that payment be made at the contract unit price bid and that there should not be an equitable adjustment to the contract. Because of the substantial changes in the quantity of soil disposed of and seepage water removed and disposed of (work units 9 through 11), the University claimed that the unit prices for this work should be equitably adjusted.
The district court did not determine what would have been an equitable adjustment to the unit prices for work units 9 through 11. Instead, it concluded that a total cost method should be used to adjust the contract. The court found that Pavers incurred $1,216,383.59 in costs and assigned a 14.2-percent overhead for general administrative costs. It further found that the total costs for the project were $1,389,110.06, which did not include any profit.
The district court concluded that neither awarding Pavers its full unit price for work units 9 through 11 nor requiring Pavers to pay out of its own pocket the increased costs would be equitable. The court found that the University failed to meet its burden for an equitable adjustment to the unit prices. However, it reasoned that a total cost method should be applied, since Pavers' exact losses and increased expenses were difficult to determine "because expenses were not tracked on a per work unit basis." The court found that the total costs expended by Pavers to complete the project were reasonable.

(b) Adjustment of Unit Prices
[9] The issue before this court is whether the unit prices for work units 9 through 11 should be reduced because there were large increases in the quantity of soil disposed of and seepage water removed and disposed of.
The University claims the district court erred in applying a total cost method to adjust the contract. In asking for an equitable adjustment, the University relies upon article 7 of the general conditions of the contract for construction. Article 7 provides:
7.1.4 If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are so changed in a proposed Change Order or Construction Change Directive that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.
The University also claims the contract states that for work units 9 and 11, the "unit price" for disposal of the soil or water could not be more than 15 percent above the actual "unit rate" disposal cost incurred for disposal from a permitted landfill, land application site, or authorized water treatment facility. Brief for appellant at 39-40. In effect, the University contends that Pavers was entitled to no more than 15 percent above the landfill fees and water treatment costs for disposal of the soil and water respectively.
*408 The provision of the contract relied upon by the University states:
PART 4-BIDDING AND COST VERIFICATION MEASUREMENT AND PAYMENT
The Contractor shall accept the compensation as herein provided, in full payment for furnishing all materials, labor, tools, equipment, and incidentals necessary to complete the Work as Lump Sum Price or Unit Price Items. . . .
. . . .

SOIL DISPOSAL shall include all equipment, materials [and] landfill fees and labor necessary for removing and hauling contaminated soils . . . based on the weight of the disposed soil in tons. . . . The unit rate for soil disposal cannot be more than 15% above the actual unit rate disposal cost incurred from a permitted landfill or land application site. . . . Payment will be made at the contract unit price per ton for "Soil Disposal".
....

SEEPAGE WATER DISPOSAL shall include all equipment, materials [and] landfill fees and labor necessary for removing, hauling and disposing of seepage water which is based in gallon units. The unit rate for seepage water disposal cannot be more than 15% above the actual unit rate disposal cost incurred from an authorized water treatment facility. Subcontract disposal costs must accompany the contractor's invoice as supporting documentation to verify that mark-up does not exceed 15%. . . . Payment will be made at the contract unit price per gallon for "Seepage Water Disposal".
[10] Our reading of these provisions does not lead us to the conclusion that the unit price was limited to a 15-percent markup of the unit rate charged by the landfill or the water treatment facility. We agree with the district court's determination that the contract specifications in work units 9 and 11 did not limit the unit price to 15 percent above the actual disposal costs, as argued by the University. These sections of the contract merely limited the markup by Pavers on the unit rate disposal costs from a landfill and/or water treatment facility to 15 percent as a part of the unit price. Each part of this contract clearly provides that payment will be made at the contract unit price. When the terms of a contract are clear, they are to be accorded their plain and ordinary meaning. Katherine R. Napleton Trust v. Vatterott Ed. Ctrs., 275 Neb. 182, 745 N.W.2d 325 (2008).
[11] The University next argues that the district court erred by using the total cost method in making an adjustment. The University relies upon Pacific Architects and Engineers, Inc. v. United States, 203 Ct.Cl. 499, 491 F.2d 734, 739 (1974), where the court stated:
It is well established that the equitable adjustment may not properly be used as an occasion for reducing or increasing the contractor's profit or loss, or for converting a loss to a profit or vice versa, for reasons unrelated to a [contract] change. A contractor who has underestimated his bid or encountered unanticipated expense or inefficiencies may not properly use a change order as an excuse to reform the contract or to shift his own risks or losses to the Government.
Pacific Architects and Engineers, Inc. v. United States, supra, does not support the University's position, because it is the University, not Pavers, that seeks an adjustment or reformation of the contract. It is the University that underestimated the quantity of soil and water to be removed and disposed of, and it is the University *409 that seeks to reform the contract and shift the costs to Pavers.
Pavers seeks to enforce the unit price of the contract it bid on work units 9 through 11. The University seeks to reform the contract and shift its risk of loss to the contractor. Since the University is asking for a change in the contract, the burden is upon the University to establish a basis for the relief sought. The University had the burden to establish why the unit prices should be equitably adjusted, and it has not sustained that burden.
The district court stated that "the University has failed to meet its burden regarding its proposed equitable adjustment to the unit prices." In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous. Henriksen v. Gleason, 263 Neb. 840, 643 N.W.2d 652 (2002). The appellate court does not reweigh the evidence but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. Id.
Pavers argues that the equitable adjustment provisions of the contract do not apply and that the district court should not have limited Pavers' award by adjusting the contract price. Pavers claims that the court erred when it concluded that some form of equitable adjustment should be applied to the contract price. We agree.
Although it was not error for the district court to examine whether an equitable adjustment to the unit prices was required, the University did not prove that such an adjustment was warranted. The record does not disclose why the court did not award Pavers the full amount of the contract, except that the court was attempting to reach what it considered an equitable result under the facts presented. However, there is no showing that the University sustained its burden of proof to entitle it to an equitable adjustment of the unit prices.
[12] We conclude the district court erred in not awarding Pavers the full amount of the contract. Without requesting an adjustment in the unit prices, the University directed Pavers to continue working on the project. The University knew large over-runs of quantity and, therefore, increased costs were occurring on a daily basis. The University was not without a remedy, as the contract allowed the University to seek an equitable adjustment while the work was being performed. If the University did not agree with Pavers as to what unit price should be charged, the University could have proceeded under the contract to seek an adjustment of the unit price.
Article 7 of the contract gave the University a method for dealing with changes in the quantities of the work to be performed. Paragraph 7.3 permits the University to issue "Construction Change Directives" to change the work and propose a basis for adjustment of the contract sum.
7.3.1 . . . The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.
7.3.2 A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.
....
7.3.6 If the Contractor does not respond promptly or disagrees with the method for adjustment in the Contract Sum, the method and the adjustment *410 shall be determined by the Architect on the basis of reasonable expenditures . . . including, in case of an increase in the Contract Sum, a reasonable allowance for overhead and profit.
Before the work was completed, the University could have sought relief under article 7 of the contract based on the fact that the quantities had increased substantially from the original estimates. Once it was determined that the quantities had been greatly underestimated, the University had the opportunity to seek an equitable adjustment. However, the University did not tell Pavers to stop the work and did not attempt to seek an equitable adjustment before the work had been performed.
Instead, the University directed Pavers to complete the project and now seeks to reduce the unit prices. We find nothing in the contract that permits the University to unilaterally reduce the unit prices in the contract after the work has been performed. Pavers performed the contract as directed by the University and should receive payment for the unit prices bid on the contract.
[13] It was not the province of the district court to rewrite or adjust the contract to reflect the court's view of what was fair. See Kozlik v. Emelco, Inc., 240 Neb. 525, 483 N.W.2d 114 (1992). Each part of the contract was bid based upon a unit price. It was incumbent upon the University to seek an adjustment of the unit prices before the work was completed or sustain its burden of proof regarding an equitable adjustment to the unit prices. Because the University did neither, we award Pavers the contract price.

VI. CONCLUSION
For the reasons set forth herein, we remand the cause to the district court with directions to enter judgment in favor of Pavers in the amount of $1,714,996.40 less credit for the amounts paid by the University.
REMANDED WITH DIRECTIONS.
HEAVICAN, C.J., and STEPHAN, J., not participating.